OPINION
Renee A. Gibson appeals from a judgment of the Montgomery County Court of Common Pleas, Domestic Relations Division, which terminated a shared parenting plan and awarded sole custody of the parties' son to his father, Eric T. Massengill.
The record reveals as follows. Gibson and Massengill were married on December 28, 1996. Their son, Rhys T. Massengill was born on May 28, 1997. Gibson and Massengill were divorced on May 12, 1999. Their divorce decree included a shared parenting decree which approved a shared parenting plan.
On October 29, 1999, Gibson filed a motion for modification of the shared parenting plan. On January 14, 2000, Massengill filed a motion for termination of the shared parenting plan and sole custody of Rhys. A custody hearing took place before a magistrate on April 25, 2000. At the hearing, Gibson withdrew her motion to modify the shared parenting plan. On June 22, 2000, the magistrate issued a decision designating Massengill to be the residential parent and legal custodian of Rhys. Gibson filed objections to the magistrate's decision. On November 14, 2000, the trial court overruled her objections and adopted the magistrate's decision.
Gibson now appeals the trial court's decision. She raises six assignments of error. Because the fourth and fifth assignments are interrelated, we will address them together.
 I. THE TRIAL COURT COMMITTED ERROR [BY] ALLOWING [MASSENGILL] TO PROCEED WITH THE HEARING WHEN HE HAD NOT FILED WITH HIS MOTION A MEMORANDUM OR AFFIDAVIT PURSUANT TO LOCAL COURT RULE 4.09(E).
Gibson argues that Massengill filed his motion for sole custody without including a memorandum or affidavit pursuant to Loc.R. 4.09(E) of the Court of Common Pleas of Montgomery County, Domestic Relations Division ("Mont. D.R. Rule 4.09(E)").
Mont. D.R. Rule 4.09(E) states:
 All motions shall state with particularity the grounds therefor, shall set forth by memorandum or affidavit the relief or order sought and shall identify any prior order(s) at issue.
Massengill's motion for sole custody did not have a "memorandum" or "affidavit" attached to it. The motion did, however, state with particularity the grounds for it "[s]aid change of parental rights should be granted due to a substantial change of circumstances since the filing of the Shared Parenting Plan * * * and for other reasons as will be evidenced at the hearing hereof." The motion set forth the relief or order sought "an Order granting [Massengill] the permanent allocation of parental rights and responsibilities of [Rhys]." The motion also identified the prior order at issue "the Shared Parenting Plan attached to the Shared Parenting Decree filed * * * on May 12, 1999[.]" Thus, although the required information was not included in a "memorandum" or "affidavit," it was clearly set forth in the motion.
Moreover, Gibson raised this issue in a motion to dismiss made for the first time on the day of the custody hearing. The magistrate overruled the motion, stating that it "would have been more properly brought forward at the pre-hearing" and that Gibson had not been harmed by the lack of a memorandum or affidavit because she knew "there were inherent problems" with the shared parenting plan since she had originally filed a motion to modify it. We agree. Aside from the fact that Massengill's motion did contain the necessary information, though not in a "memorandum" or "affidavit," Gibson was aware that there were problems with the shared parenting plan. Further, had she brought this issue to the court's attention at the pre-hearing, Massengill could have cured the problem by amending his motion. See Mont. D.R. 4.09(I). The magistrate's decision to overrule Gibson's motion to dismiss was also in accord with Mont. D.R. Rule 4.01(C), which states that, in applying the local rules of the Montgomery County Court of Common Pleas, Domestic Relations Division, the rules "shall be construed so as to provide fairness and to secure just, expeditious and inexpensive determination of all proceedings." Had the magistrate dismissed Massengill's motion for sole custody on the day of the custody hearing simply because it did not contain a "memorandum" or "affidavit," the court would not have been construing the rules to secure a just, expeditious, and inexpensive determination of the matter. Indeed, Gibson does not contend that she was prejudiced by this nonconforming motion.
The first assignment of error is overruled.
 II. THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN NOT GRANTING A NEW HEARING FOR THE TESTIMONY OF GORDON HARRIS PH.D. AND DR. JODI REILING, M.D.
Gibson argues that the trial court erred in "not granting a new hearing" so that Dr. Gordon Harris and Dr. Jodi Reiling could testify.
At the beginning of the custody hearing, the magistrate noted that Gibson's attorney had filed a motion to continue the hearing because Dr. Harris and Dr. Reiling were unavailable to testify that day. Although Gibson argues that her motion for a continuance was not ruled on, the record reveals that the magistrate stated that he would give Gibson some "leeway" and was willing to "reschedul[e] another day if we need to do it to bring in those individuals." Further, Massengill's attorney admitted that he had "no problem with a continuance for Dr. Harris." When Massengill's attorney argued that he did not want a continuance for Dr. Reiling to testify, the court stated that it found "just cause to bring her back at a later time as well." Thus, it appears from the record that the magistrate was willing to allow Drs. Harris and Reiling to testify at a later time.
Throughout the remainder of the transcript of the hearing, there is no further mention of testimony from the doctors. In fact, at the conclusion of the hearing, the magistrate stated, "Then [Gibson]'s Exhibits are admitted without objection and I will take the matter under advisement and issue a decision. Thank you." Both attorneys then thanked the magistrate and the hearing concluded. In adopting the magistrate's decision, the trial court found that the magistrate had been willing to schedule additional time to allow Gibson to present testimony from the doctors but that Gibson had not pursued that opportunity in a timely manner.
Gibson now argues that the magistrate erred because it "never rescheduled these two witnesses to testify." Such argument is not persuasive. It was not the magistrate's responsibility to reschedule the testimonies of the doctors. If Gibson had wished to present their testimonies, she should have indicated the doctors' availabilities to the court and assured that an additional hearing was scheduled. Further, in Massengill's response to Gibson's "supplemental objections" to the magistrate's decision, Massengill's attorney at the custody hearing stated that the magistrate had offered Gibson the opportunity to reschedule additional time for the doctors' testimonies both at the beginning and end of the custody hearing. Massengill's attorney also stated that Gibson's attorney had indicated to the magistrate, during a telephone conference between counsel and the court, that he had discussed the matter with Gibson and that "it would not be necessary to call Dr. Harris and Dr. Reiling[.]" We conclude that although the magistrate was willing to allow Gibson to present the doctors' testimonies, she waived her opportunity to do so.
The second assignment of error is overruled.
 III. THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN ADMITTING THE PSYCHOLOGICAL REPORT WITHOUT ALLOWING [GIBSON] CROSS-EXAMINATION OF THE PSYCHOLOGIST.
Gibson argues that the magistrate and trial judge should not have reviewed Dr. Harris's report in making their decisions.
R.C. 2317.39 states as follows:
 Whenever an investigation into the facts of any case * * * pending at the time of such investigation in any court, is * * * conducted * * * by any court or any department thereof, through public employees, paid private investigators, social workers, friends of the court, or any other persons, and a report of such investigation is prepared for submission to the court, the contents of such report shall not be considered by any judge of the court wherein such case is pending * * * unless the full contents of such report have been made readily available and accessible to all parties to the case or their counsel. The parties or their counsel shall be notified in writing of the fact that an investigation has been made, that a report has been submitted, and that the contents of the report are available for examination. Such notice shall be given at least five days prior to the time the contents of any report are to be considered by any judge of the court wherein the case is pending. * * *
This section does not apply only to the utilization of the contents of such reports as testimony, but shall prevent any judge from familiarizing himself with such contents in any manner unless this section has been fully complied with.
The decisions of the magistrate and the trial judge indicate that both familiarized themselves with the contents of Dr. Harris's report. Gibson argues that they should not have been able to familiarize themselves with Dr. Harris's report because the requirements of R.C. 2317.39 were not met.
On January 20, 2000, the trial court issued a pre-hearing order, which stated, in part:
 Dr. Gordon Harris shall perform a psychological examination and evaluation to assist in determination of parental rights. A report shall be submitted to the court and counsel. * * * The report of the psychologist shall serve as direct examination of the psychologist. A party desiring to cross-examine is responsible for arranging the psychologist's appearance.
Dr. Harris's report was mailed to the court and the parties' attorneys on April 5, 2000. Thus, the parties were notified, in writing, that Dr. Harris would be making the investigation. The parties were notified that the investigation had been made and had been submitted when they received copies of Dr. Harris's report. Further, the full contents of Dr. Harris's report were made readily available to the parties when they received their copies. They received their copies around April 5, 2000. The custody hearing was not until April 25, 2000, so they had notice at least five days before the magistrate and trial judge would have considered the report. Thus, the requirements of R.C. 2317.39 were satisfied.
Gibson also argues that the magistrate and trial judge should not have been able to consider Dr. Harris's report because she was not able to cross-examine Dr. Harris as was required by R.C. 3109.04(C). As we stated previously, Gibson waived her opportunity to cross-examine the doctor.
The third assignment of error is overruled.
 IV. THE TRIAL COURT ERRORED [sic] AND ABUSED ITS DISCRETION WHEN IT RELIED ON INCORRECT LAW, FAILING TO REQUIRE [MASSENGILL] TO PROVE A CHANGE IN CIRCUMSTANCES.
 V. THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN SUSTAINING THE MAGISTRATE'S DECISION AS THERE ARE NO CHANGES IN CIRCUMSTANCES.
Gibson argues that the trial court erred in not requiring a finding of a change in circumstances before terminating the shared parenting plan. She further asserts that the evidence did not reveal a change in circumstances.
In his motion, Massengill sought to terminate the shared parenting plan and to be awarded sole custody of Rhys. As we have held in other cases, pursuant to R.C. 3109.04(E)(2)(c), the trial court was not required to find a change in circumstances before terminating the shared parenting plan. Quesenberry V. Quesenberry (Nov. 6, 1998), Champaign App. No. 98 CA 1, unreported; Goetze v. Goetze (Mar. 27, 1998), Montgomery App. No. 16491, unreported. See, also, Dobran v. Dobran (Sept. 1, 1999), Mahoning App. No. 97 CA 166, unreported (listing other appellate districts in agreement with that conclusion).
Gibson relies on Miller v. Miller (1996), 115 Ohio App.3d 336,685 N.E.2d 319 to support her argument. That case involved the modification of a shared parenting plan, not the termination of a shared parenting plan. A change in circumstances must be found before a trial court can modify a shared parenting plan. R.C. 3109.04(E)(1)(a); Goetze, supra; Dobran, supra. A change in circumstances does not have to be found before a trial court can terminate a shared parenting plan. R.C.3109.04(E)(2)(c); Quesenberry, supra, Goetze, supra; Dobran, supra. Thus, the trial court did not err in not requiring a change in circumstances before terminating the shared parenting plan in this case and we need not determine whether the evidence supported a finding of a change in circumstances.
The fourth and fifth assignments of error are overruled.
 VI. THE TRIAL COURT COMMITTED PREJUDICIAL ERROR AS THE DECISION IS MANIFESTLY AGAINST THE WEIGHT OF THE EVIDENCE.
Gibson argues that the trial court's decision was against the manifest weight of the evidence.
A judgment that is supported by some competent, credible evidence will not be reversed as being against the manifest weight of the evidence. Seasons Coal Co., Inc. v. Cleveland (1984), 10 Ohio St.3d 77, 80,461 N.E.2d 1273, 1276. Further, "[t]he discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." Miller v. Miller (1988), 37 Ohio St.3d 71, 74, 523 N.E.2d 846, 849.
R.C. 3109.04(E)(2)(c) states that the trial court may terminate a shared parenting plan if it determines that shared parenting is not in the best interest of the child. In determining whether shared parenting is in the best interest of the child, the court shall consider all relevant factors, including those listed in R.C. 3109.04(F)(2), 3109.04(F)(1), and 3113.215(B)(3). R.C. 3109.04(F)(2). With those factors in mind, we will review the trial court's decision to terminate the shared parenting plan and to award custody to Massengill.
At the custody hearing, Gibson testified that although she wished that she and Massengill "could get along well enough [for shared parenting to work,] the fact is [they] can't." [Tr.p. 167] When asked how she and Massengill had communicated while the shared parenting plan had been ongoing, she stated, "We don't at all. There is no communication. [Massengill]'s a very hard person to like and he's even harder to get along with." [Tr.p. 161-162].She later testified the "[t]he reason that there should be sole custody is because [Massengill] and I don't agree. We have no communication skills between the two of us." [Tr.p. 176] Massengill's testimony reflected, similarly, that he and Gibson could not cooperate and make decisions jointly regarding Rhys. Based upon this evidence, we believe the trial court's decision to terminate the shared parenting plan was supported by competent and credible evidence.
Testimony at the custody hearing further revealed that Gibson had lived in three different locations since she and Massengill had separated. As a result, Rhys had been in three different daycare centers. Between the summer of 1996 and the date of the custody hearing, Gibson had had approximately ten different jobs because she had either quit, been fired, or the employer had gone out of business. The day after Rhys's hernia operation, Gibson refused to allow Massengill to stay with Rhys, as Massengill had volunteered to do, and instead sent him to daycare. Gibson did not provide Rhys with consistent treatment for his ear wax problems. Gibson disapproved of Massengill taking Rhys to church. Gibson had told Massengill that Rhys was sick on some of Massengill's scheduled visitation days and on one occasion, Massengill drove to Gibson's home and found Rhys "jumping around and laughing." [Tr.p. 102] Gibson refused to allow Massengill extra visitation with Rhys, although Massengill repeatedly requested it. During her individual session with Dr. Harris, Gibson made a number of improper statements: she called Massengill's family "`hillbillies who are proud they have a dirt floor,'" she described his parents as "`boring people who have no lives'" and "`the most backward people [she] ever knew,'" she called Massengill the worst parent she had ever seen, and she talked about Massengill "`dragging [Rhys] to some church basement with some snotty nosed kids, supervised by an old lady who lets them beat up on each other.'" At the custody hearing, she stated that those comments were "jokes." During the session where she and Rhys were evaluated by Dr. Harris, after playing with Rhys for approximately fifteen to twenty minutes, Gibson "diverged into her own agenda and began talking about things which were inappropriate to be discussed in that setting."
Massengill had been employed at the same job for three years at the time of the custody hearing. He tried "to stay as consistent * * * as possible with [Rhys's] lodgings." [Tr.p. 41] Massengill preferred that his family members babysit Rhys instead of a daycare center and Massengill had worked out a schedule whereby his mother would stay at his home overnight during his visitations with Rhys while Massengill worked his third shift job. Massengill assigned Rhys three small "chores" to "teach him a sense of responsibility." [Tr.p. 70] Massengill believed religion was important and took Rhys to church. Massengill testified that if he were awarded custody, he would want Gibson to have "[l]iberal visitation" with Rhys and would be flexible to accommodate Gibson's scheduling conflicts. He also stated that he believed it was important for Rhys to spend time with his paternal and maternal grandparents.
Dr. Harris met with Gibson, Massengill, Gibson and Rhys, and Massengill and Rhys. In his report, he stated that Gibson had "quite strange" beliefs about children, that she had "demonized [Massengill] and his parents and [had] downgraded positive things in [Rhys's] life," that "[a]lthough [Gibson] occasionally made a verbalization otherwise, her attitude towards [Rhys's] father [and his parents] was quite clear [s]he would appear to want herself or Rhys to have nothing to do with them if possible." Dr. Harris acknowledged that Massengill had some personality problems, but stated that Massengill had an awareness of those problems and was "better able to recognize his son as an individual and seems to have a healthier outlook on the needs [Rhys] will have in this family situation." Dr. Harris also stated that Massengill "has a better perspective on what is appropriate and inappropriate in raising a child and does not have the same propensity for hostility and alienation that [Gibson] has." He concluded that Rhys "would be best off in the custody of [Massengill]."
Because there was competent and credible evidence to support the trial court's decision that Massengill should be designated as Rhys's residential parent and legal custodian, we will not conclude that the trial court's decision was against the manifest weight of the evidence.
The sixth assignment of error is overruled.
The judgment of the trial court will be affirmed.
 _________________ WOLFF, P. J.
FAIN, J. and YOUNG, J., concur.